52 CCPA

**Application of Ewald KATZSCHMANN.**

**Patent Appeal No. 7406.**

United States Court of Customs and Patent Appeals.

June 24, 1965.

Worley, C. J., and Martin, J., dissented.

Paul M. Craig, Jr., James E. Bryan, Washington, D. C., for appellant.

Clarence W. Moore, Washington, D. C. (J. E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

SMITH, Judge.

As an improvement on the process of his U. S. Patent 2,894,978 appellant discovered that undesirable by-products were reduced and an improved space-time yield was achieved in the production of esters of phthalic acids by 1) using xylenes of 98.5% concentration and 2) using p-xylene or m-xylene. His application for patent on this improved process [1] has been refused under 35 U.S.C. § 103 as covering but an obvious modification of the process of appellant's Canadian patent No. 557,345, issued May 13, 1958. Appellant states that this patent corresponds to his U. S. patent which was acknowledged to be prior art.

The rejection of claims 1–8 is here on appeal. While differing in scope, it is clear that the claims will stand or fall

[1]. Serial No. 24,680, filed April 26, 1960 for "Process for the Production of Esters of Phthalic Acids."

together. The broadest of these claims is claim 1 which reads as follows:

1. In a process for producing esters of phthalic acids from mixtures of xylene and esters of toluic acids with monovalent alkanols, the steps which comprise oxidizing a mixture of a xylene selected from the group consisting of p-xylene having a concentration of at least 98.5% and m-xylene having a concentration of at least 98.5% and esters of toluic acids with alkanols in the proportion by weight between about 1:3 and, at the most, 1:1 in the liquid phase with an oxygen-containing gas at a temperature between about 80° C and about 250° C in the presence of an oxidation catalyst for a prolonged period of time until the xylenes are substantially completely oxidized.

Claim 6 is more specific in specifying that the alkanol is one having 1 to 4 carbon atoms, and in adding the step of "esterifying the resulting oxidate under pressure." Claims 2 to 5 depend from claim 1, and 7 and 8 depend from claim 6, and each recites variations with respect to known temperature and pressure conditions and to known reactants used in the specific reaction mixture.

In rejecting the claims, the examiner and the board rely upon the disclosure in examples 1 and 2 of the Canadian patent in which 96% p-xylene is used, the position as summarized by the solicitor in his brief here being:

\* \* \* This disclosure was construed by the examiner to mean to one skilled in the art that the degree of purity of the xylene reactant is not critical and that the optimum conditions would be determined by the individual experimenter by routine experimentation.

We think the basic error of the examiner and the board was in failing to consider appellant's claimed subject matter "as a whole" as required by section 103. If nothing more than non-critical percent concentrations of react-ants were here involved, perhaps the position of the examiner could be sustained. However, the improved process as a whole as disclosed is restricted to the use either of p-xylene or m-xylene of such concentrations.

We find no teaching in the Canadian patent that the use of *either* p-xylene *or* m-xylene in concentration of 98.5% and above would be expected to improve the results of the disclosed process. To the contrary, we not only find no appreciation of this aspect of the invention in the Canadian patent but we find that in addition to the 96% p-xylene specified in examples 1 and 2, the Canadian patent asserts:

It is, of course, also possible to employ, in place of p-xylene and of the methyl ester of p-toluic acid, equimolecular amounts of o-xylene or m-xylene and of the methyl esters of o-toluic acid or m-toluic acid. Likewise, a mixture of xylenes, such as a commercial product containing, for instance, 66% of m-xylene, 33% of p-xylene, and the remainder being o-xylene and ethyl benzene, as well as mixtures of the methyl esters of m-toluic acid and p-toluic acid with small amounts of o-toluic acid may also be employed as starting material. \* \* \*

The solicitor has directed our attention to In re Aller, 220 F.2d 454, 42 CCPA 824, as a controlling authority in the present situation. As we see it, the Aller case recognized that under some circumstances changes such as temperature and concentration or both "may impart patentability to a process if the particular ranges claimed produce a new and unexpected result." Here, we think the record establishes that appellant's claimed improvements did produce a new and unexpected result. As stated in the specification:

It has now been found that an unobvious and unexpected result in the production of iso- or tere-phthalic acid dimethyl ester is obtained when 98.5 to 100% p- or m-xylol is utilized.

The use of such xylols is particularly effective in restricting the formation of by-products. In addition thereto, the yield is high and entirely unexpected when compared to the theoretical yield and the space/time yield.

The specification also states:

The utilization of xylenes in concentrations of from 98.5 to 100% is of particular significance or value for the end product with regard to the minimization of by-products and the production of polyesters, since the substantial decrease in the formation of by-products and the increase of the theoretical yield due to the increase of the concentration of p- or m-compounds finds a special interest technically.

In addition to the foregoing, the record contains an affidavit dated July 23, 1962, which sets forth facts by one whose stated qualifications certainly establish him as a person of skill in this art. The examiner and the board appear to have given little weight to this affidavit on the issue here, i. e., would the claimed improvements have been obvious to one of ordinary skill in this art. The affidavit contains the following statement of fact:

By means of the present improvement, i. e., by the use of 98.5 to 100% xylenes, not only are high yields in the end products and less by-products obtained, as is to be expected, but the present improvement also constitutes a distinct advantage in that a high space-time yield is attained. Particularly when employing xylenes in concentrations as described according to the present invention, the economy and industrial efficiency of the oxidation process according to U. S. patent 2,894,-978 is increased in a decisive manner. If the normal increase with regard to the yield relative to the theory is taken as the basis, for example, between a 95.5% and 96.4% p-xylene, then a yield of 84.75% as compared to the theory can be expected when using a 98% p-xylene. Yet, as set forth in the subject application, a 88.5% yield as compared to the theory is found. When using a 99.4% p-xylene, a previously assumed yield of 86.3% as compared to the theory is found; however, a yield of 91% as compared to the theory is actually found. A similar critical behavior is found for the by-products. * * *

The affidavit also states:

At the time of filing the application upon which the above-mentioned patent is based, a high [-er] quality than 96% p-xylene was not made for industry, or even demanded thereby because it was believed that the last per cent of purity would require too high and uneconomical an expenditure. The manufacture of industrial amounts of high per cent xylenes, particularly p-xylene, was begun only after the discovery of the improvement process of the present application and the demands resulting therefrom. * * *

■ We do not think it was the intent of section 103 that either the examiner, the board or this court should substitute their own speculations for the factual knowledge of those skilled in the art. Where, as here, an affidavit states facts which are relevant to the ultimate determination of the legal issue arising under section 103, we think it must be given careful evaluation and properly weighed to determine whether it factually rebuts the bases upon which the examiner has predicated his finding of obviousness. Thus an affidavit such as that of record here may well shift the burden of proof to the examiner to then come forward with further support for his conclusion that the invention would have been obvious under the conditions stated in section 103. In other words, we think the affidavit here factually rebutted the Canadian patent as a basis for the as-

serted obviousness of the claimed invention.

The decision of the board is reversed.

Reversed.

WORLEY, Chief Judge, dissenting, with whom MARTIN, J., joins.

The point which forms the principal reason for my disagreement with the majority opinion is the inordinate weight given appellant's affidavit.

Appellant's specification, as illustrated by the quotations set out by the majority, points out that use of 98.5% to 100% p- or m- xylene results in a decrease in by-product formation as well as yields which are high and "entirely unexpected" when compared to the ordinarily expected theoretical yield and space-time yield. I consider those statements in the specification to be well tempered by appellant's concession in his affidavit, also quoted by the majority, that:

> By means of the present improvement, i. e., by the use of 98.5 to 100% xylenes, not only are *high yields* in the end products and *less by-products* obtained, *as is to be expected,* but the present improvement also constitutes a distinct advantage in that a high space-time yield [1] is attained. * * * [Emphasis supplied].

The examiner noted:

> * * * The result of using purer materials is precisely that expected, i. e. an increase in the yield with less side-reactions. * * *

and appellant, in his brief before the board, stated

* * * One expects a higher yield when using a purer starting material.

In view of the results expected when one uses purer starting material, it seems to me adequate reason has been provided to do what appellant has done. Weighing all the evidence, I do not find reversible error in the board's conclusion that the subject matter as a whole is obvious to one of ordinary skill. I would affirm.

1. Neither appellant nor the Patent Office has furnished a definition of space-time yield from which we can evaluate the merits of the contentions with respect thereto. Perry's Chemical Engineering Handbook, 3rd Edition, states at page 329:
> * * * Space velocity is defined to be the volume of gas * * * or liquid passing through a given volume of catalyst space $v_c$ in unit time divided by the

latter, i. e. space velocity = $V/v_c$. * * * The yield of desired product in unit time per unit volume of catalyst per passage is the space-time yield. This is the product of the fractional conversion F by the space velocity, space-time yield = $F(V/v_c)$.

Increasing the purity of starting material would necessarily appear to increase the value of at least F in the above equation, thereby increasing space-time yield.