SITE MICROSURGICAL SYSTEMS,
INC., Plaintiff,

v.

SURGIN SURGICAL
INSTRUMENTATION INC., Defendant.

Civ. No. 92–4706.

United States District Court,
E.D. Pennsylvania.

June 10, 1994.

---

## OPINION

**LOUIS A. POLLAK, District Judge.**

Plaintiff Site Microsurgical Systems ("Site") sells ophthalmology microsurgery equipment. In particular, Site manufactures and markets a device—known as the Site TXR system—that enables one performing eye surgery to introduce fluid into, and withdraw fluid from, the operative arena in order to keep the eye stable and free of debris. The TXR system depends on a patented "cassette" system that contains the tubing through which the fluid flows and a canister that catches the aspirated materials. Defen-

dant Surgin Surgical Instrumentation ("Surgin"), also a manufacturer of medical equipment, markets a cassette device that it claims is compatible for use with the Site TXR.

Site's complaint charges Surgin with patent infringement and false advertising. On December 9, 1992, following extensive hearings, I granted Site's motion for a preliminary injunction with respect to claims 15, 17 and 18 of Site's '250 patent. The '250 patent covers the "microsurgical system cassette assembly" that is a component of the TXR.

In September 1993, I denied Surgin's motion for summary judgment on Site's reissue claims—claims 12 through 18 of the '250 patent. Surgin argued in that motion that technical defects in the reissue application rendered the reissue claims ineffective. I gave Surgin leave to renew that motion at a later date.

Presently before this court are: (1) Surgin's motion for summary judgment on claims 1–14 and 16 of the '250 patent (docket # 96);[1] (2) Surgin's renewed motion for summary judgment on the reissue claims (claims 12–18) (docket ## 99–102); and (3) Surgin's motion for an increase in the security bond amount (docket # 103). Having heard oral argument on April 8, 1994, with respect to these motions, I will now address each motion in turn.

## I. Factual background

The following facts appear to be undisputed. During eye surgery, a proper balance between the infusion (delivery) of fluid into, and aspiration (suction) of fluid from, the eye must be maintained lest the eye collapse. Prior to the 1980s, although aspiration-irrigation systems were commonly used, they required individual components (consisting of filters, valves, collection bags, etc.) that took time to assemble. Apparently, there was no easy method of connecting the required tubing, and hospital staff had to thread tubing through numerous valves before operations. The big innovation represented by the SITE TXR was the aggregation of the aspiration

---

1. Site indicated at oral argument that it is not arguing that the Surgin device infringes claim

# 9 of the '250 patent.

and infusion subsystems into a single network of tubing, contained in a cassette device, that could be snapped onto the front of the TXR console. The Site TXR contains two lines of tubing. One connects to a vacuum pump, providing aspiration; the other connects to an IV solution, providing infusion. Therefore, only three connections are required (the infusion output tube to the console, the infusion input tube to the IV reservoir, and the aspiration tube to the console). Then, the surgeon can close or open the two pathways by depressing a foot pedal.

Certain claims in Site's original patent ('833)—issued on December 9, 1986—were subsequently rejected, and the present patent ('250) was reissued on July 3, 1990.

The Surgin system was conceived in October, 1989 and introduced two years later at a meeting of the American Academy of Ophthalmology. Unlike the Site system, the Surgin system is not an aggregated unit; rather, there are three separate subassemblies: (1) an aspiration adaptor housing that snaps into the TXR console (where the entire Site cassette would normally fit) [the adaptor]; (2) a fluid delivery subassembly which contains the infusion line and snaps into the adaptor housing [the irrigation cassette]; and (3) a fluid collection canister connected by tubes to the adaptor housing and clipped to the side of the TXR (unlike the SITE collection device which sits in a cove in the front of the console) [the collection canister]. Therefore, the irrigation and aspiration functions are separated, and, according to defendant, the Surgin devices require seven preoperative connections (as compared to only three connections required by Site's device). Although utilization of its system is admittedly more time-consuming, Surgin claims that its system was designed to pro-

duce cost savings because, unlike the Site system—in which the entire cassette assembly must be discarded and replaced after each surgical procedure—, the Surgin system allows the aspiration subsystem and collection vessel to be retained and reused (only the infusion subsystem must be discarded after each procedure). On Surgin's view, its multi-component system sacrifices ease of preoperative set-up for cost savings. A patent on this device was issued on May 28, 1992.

## II. Surgin's motion for summary judgment on claims 1–14 and 16 of the '250 patent

▪ In its motion for summary judgment, Surgin argues that its product does not literally infringe claims 1–14 and 16 of the '250 patent. Literal infringement occurs when each and every element of a patent claim is found in the allegedly infringing device. *Mannesmann Demag Corp. v. Engineered Metal Prod.*, 793 F.2d 1279, 1282 (Fed.Cir.1986). Therefore, the court must look at each patent claim individually, define its scope, and determine whether the claim—as properly interpreted—encompasses (or "reads on") the accused product. *Mannesmann*, 793 F.2d at 1282. In defining a claim's scope, a court must first consider the words of the claim, *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855–56, 94 L.Ed. 1097 (1950), and then—and most especially when the words are susceptible to two or more interpretations[2]—must consider the specification of the patent, other claims in the patent, prosecution history before the Patent Office, and expert testimony. *See United States v. Adams*, 383 U.S. 39, 48–49, 86 S.Ct. 708, 712–13, 15 L.Ed.2d 572 (1966) ("While the claims

2. Some courts and commentators have opined that only in very rare instances can the words of a claim be properly found to be clear and unambiguous. *See Autogiro Co. of America v. United States*, 384 F.2d 391, 181 Ct.Cl. 55 (1967); Chisum, *Patents* § 18.03 at 18–33 and n. 10 (1992). And the Federal Circuit has suggested that the specification, prosecution history and prior art should be consulted even when there is literal correspondence between a claim and the accused device, as long as the defendant disputes that the claims language, as properly interpreted, reads

on his device. *See SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed.Cir.1985). Therefore, it would seem a safe general rule that claims should be evaluated in light of specifications. However, other courts and commentators have emphasized that it is not permissible to look beyond a clear claim to the specification. *See Paeco, Inc. v. Applied Moldings Inc.*, 562 F.2d 870, 874 (3d Cir.1977); *Carlson v. Nagata*, 480 F.2d 1372, 1375 (Ct. of Customs and Patents 1973).

... limit the invention, and specifically cannot be expanded to expand the patent monopoly, ... claims are to be construed in light of the specifications and both are to be read with a view to ascertaining the invention"); *McGill, Inc v. John Zink Co.*, 736 F.2d 666, 673–75 (Fed.Cir.1984), *cert. denied* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). Terms in a claim "will be given their ordinary and accustomed meaning unless it appears that the inventor used them differently." *E.g., SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878, 882 (Fed.Cir.1988). Claim interpretation is a question of law for the court. *See Read Corp. v. Portec Inc.*, 970 F.2d 816, 821 (Fed.Cir.1992). The question of literal infringement is, however, a question of fact. *See Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1054 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988).

In its motion for summary judgment, Surgin first explains that claims 1, 5, 12 and 13 of the '250 patent require a collection vessel "supported by" the cassette assembly housing. Claim 1, for example, provides:

> A cassette assembly adapted for releasable securement to a control console for use in ophthalmic surgery comprising: ...
>
> a collection vessel *supported by* said housing and having a first port for providing fluid communication between a source of vacuum and said collection vessel and having a second port in fluid communication with said first occludable tubular conduit means.

(emphasis added). Surgin cites the Webster's Dictionary definition of "support" as follows: "to hold up or serve as a foundation or prop for." Webster's Ninth New Collegiate Dictionary, at 1186 (1990). Surgin then argues that the Surgin collection canister is a unit separate from the housing and is therefore not supported by the housing. Because this element of claims 1, 5, 12 and 13 of the '250 patent is not infringed, Surgin argues, none of those claims is infringed. Surgin further argues that, because claims 2–4 are dependent claims that contain all of the limitations of claim 1, and because claim 6 is a dependent claim that contains all of the

limitations of claim 5, claims 2–4 and 6 are not infringed.

Surgin next explains that claims 7, 11, 14 and 16 of the '250 patent all contain the limitation of a "housing including a body portion and a collection vessel *removably mounted* to said body portion." (Surgin's emphasis). According to Webster's Dictionary, "mount" means "to attach to a support," Webster's Ninth New Collegiate Dictionary, at 775, and "remov[able]" means capable of "chang[ing] the location, position, station or residence of." Webster's Ninth New Collegiate Dictionary, at 997. Surgin then asserts that its cassette assembly and collection vessel are entirely separate. Therefore, Surgin claims, there is no infringement of claims 7, 11, 14 and 16; nor is there infringement of dependent claims 8 and 9, which incorporate the limitations of claim 7.

Finally, Surgin explains that claim 10 contains the limitation of a "vent means disposed in said upper housing portion, containing said suction port." Surgin argues that its device contains a suction port in the lower portion of the housing rather than in the upper portion of the housing, and that therefore there is no infringement.

■ In its response, Site concedes that there is no literal infringement of claim 10. Site argues, however, that Surgin's device does literally infringe the other claims of the '250 patent. First, Site argues that the collection canister of the Surgin device can be positioned so that it hangs by the tubing connecting it to the cassette housing. When so configured, Site argues, the collection vessel is "supported by" the cassette housing. As Surgin pointed out on oral argument, the flaw in Site's argument is that, so positioned, the Surgin device would be unusable for two reasons. First, a dangling collection canister would not be level, and the canister must be level to enable the surgeon to measure the amount of fluid in the canister against the markings on the canister. Second, allowing the canister to dangle would pinch the tubing and impair or prevent suction. For these reasons, I conclude that the Surgin device does not include a collection vessel "supported by" the cassette housing. According-

ly, claims 1–6, 12 and 13 are not literally infringed.

■ Site next argues that the Surgin device literally meets the limitation found in claims 7, 11, 14 and 16 (and in dependent claims 8 and 9), that the collection canister be "removably mounted" to the cassette housing. Site contends that the Surgin canister is connected to the Surgin cassette by male and female lures which facilitate direct connection of the fluid pathway. Site argues that "[t]hese lures, *i.e.*, the connectors that attach the tubes to the ports, may be easily and quickly attached, removed or re-attached, making the collection canister 're-movably mounted to' Surgin's cassette." *See* Site's Response to Surgin's Motion for Summary Judgment, at 3. I find this argument unpersuasive. The pictures and descriptions of Surgin's device show that the collection canister is clipped to the side of the TXR console. Tubes run from the canister to the cassette and then are attached to the cassette by the lures to which Site refers. Although one might say the lures are "removably mounted" to the cassette, the most one could say about the canister is that it is removably mounted to the side of the TXR console. Accordingly, I conclude that there is no literal infringement of claims 7–9, 11, 14 and 16.

■ In addition to making arguments for literal infringement, Site also argues that the Surgin device infringes Site's patent claims under the doctrine of equivalents. The doctrine of equivalents provides that, even if there is no literal infringement, an accused product infringes if it performs substantially the same function, in substantially the same way, to achieve substantially the same result, as the patented device. *See Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097 (1950); *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed.Cir.1987). Under the current state of the law, whether a device infringes under the doctrine of equivalents is a question of fact. *See Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1057 (Fed.Cir.) ("Whether a device is equivalent to a claimed invention is a factual inquiry"), *cert. denied*, 488 U.S. 825,

109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Surgin cites *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534 (Fed.Cir.1991) for the proposition that the doctrine of equivalents is not an automatic "second prong" of every infringement analysis. The *London* court stated:

Application of the doctrine of equivalents is the exception, however, not the rule, for if the public comes to believe (or fear) that the language of patent claims can never be relied on, and that the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose. Competitors will never know whether their actions infringe a granted patent.

*Id.* at 1538. That having been said, the *London* court nonetheless went on to conduct an analysis under the doctrine of equivalents. Indeed, Surgin cites no cases in which a court expressly foregoes analysis under the doctrine of equivalents.

The Federal Circuit is currently considering en banc whether there should be an equitable threshold for application of the doctrine of equivalents. *See Hilton Davis Co. v. Warner–Jenkinson Co.*, CA No. 93–1088 (Fed.Cir.) (en banc). In *Hilton–Davis*, the plaintiff acknowledged that the defendant had not literally infringed its patented food-dyeing process but won a jury verdict under the doctrine of equivalents. On appeal, the Federal Circuit sua sponte ordered en banc consideration and requested that the following questions be briefed:

(1) Does the finding of infringement under the doctrine of equivalents require anything beyond proof that the accused device performs the same or substantially the same function in the same way to achieve the same result, i.e., the tripartite test of *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 608–09 [70 S.Ct. 854, 856–57, 94 L.Ed. 1097] (1950), and the cases it relied on? If so, what?

(2) In the absence of literal infringement, is application of the doctrine of equivalents within the trial court's discretion? and

(3) Is the issue of infringement under the doctrine of equivalents an equitable remedy to be decided by the court, or is it, like literal infringement, an issue of fact to be submitted to the jury in a jury case?

*See En Banc Federal Circuit Hears Argument On Doctrine of Equivalents and Equity,* Patent, Copyright & Trademark Journal (BNA) No. 47, at 442–43 (March 17, 1994). The Federal Circuit has not yet decided *Hilton–Davis.* At this stage I will proceed in a manner most consistent with the current state of the law, and allow Site to argue that its evidence creates a material issue of fact for the jury regarding its allegation that Surgin's device infringes under the doctrine of equivalents. Surgin may, however, move to reopen this issue, should the Federal Circuit issue an opinion that Surgin deems inconsistent with this court's approach.

 Site argues that its evidence creates a material issue of fact with respect to its allegation that the claims of its '250 patent are infringed under the doctrine of equivalents. Regarding the requirement that the collection canister be supported by the cassette housing, Site's expert, Charles Beuchat, says in his affidavit:

[T]he Surgin device performs the same function (providing a collection canister as part of the cassette assembly fluid pathway), in the same way (through coupling the canister into the fluid pathway), for the same result (providing for an aspirated circuit including a collection canister applicable to ophthalmic surgery).

Site's Response to Surgin's Motion for Summary Judgment, at 6. According to Site (and Beuchat), the reason that the collection canister is clipped to the TXR console rather than attached to the cassette is that it is too large to fit into the cove in the front of the Site machine. As I explained 'above, under the current state of the law, the question whether a device infringes under the doctrine of equivalents is a question of fact. Unless Surgin advances an uncontested functional reason for the "supported by" limitation not served by the Surgin configuration, the Beuchat affidavit creates a disputed issue of material fact. Surgin makes the same argument—what I will call the "integration argument"—to refute Site's claim that the Surgin device infringes the "supported by" limitation under the doctrine of equivalents that it makes to refute Site's claim that the Surgin device infringes the "removably mounted" limitation under the doctrine of equivalents. I will therefore reserve analysis of Surgin's integration argument for the moment.

With respect to the requirement that the collection canister be "removably mounted" to the cassette housing, Site's doctrine of equivalents argument similarly appears to create a material issue of fact. According to Beuchat:

[T]he canister provides the same function as the claim limitation (by providing a collection vessel in proximity to the housing which can readily be emptied during surgery), in the same way (by positioning the collection vessel within the fluid pathway but allowing it to be easily disconnected from and reconnected to that pathway), and achieves the same result (providing for a collection canister within the aspiration pathway which can be easily emptied and then repositioned in place).

*See* Site's Response to Surgin's Motion for Summary Judgment, at 7. It is difficult to imagine what function the requirement that the canister be removably mounted to the cassette housing rather than to the console could serve, unless integration of the components with the housing is the primary benefit of the Site device. Surgin makes precisely this integration argument in its reply brief.

Surgin's argument in its reply brief builds upon the following statement made in the "facts" section of its opening brief:

The essence of the "cassette assembly" in claims 1–9, 11–14 and 16 of the '250 patent is the integration of individual recited components into a single cassette. The resultant cassette is therefore an integrated unit (Exhibit 1, col. 10, lines 13–22). The elements of claims 1–9, 11–14 and 16 which must be integrated into a single unit include a collection vessel and a housing. The integration into a single unit is accomplished by requiring that the housing "support" the collection vessel as recited in claims 1, 5, 12 and 13 and that the collec-

tion vessel be "mounted" to the housing as recited in claims 7, 11, 14 and 16.

Surgin's Motion for Summary Judgment, at 1–2. Surgin argues in its reply brief that the limitations requiring that the collection canister be supported by and removably mounted to the cassette housing must be read in light of a definition of the cassette assembly as a single integrated unit. That is, the functional purpose served by those limitations is that they bring the collection canister together with the cassette housing and so integrate the device—in contrast to the Surgin device, in which the collection canister is separate from the housing.

The flaw in Surgin's argument is not that it does not follow from its premise, but that its premise—that the essence of Site's cassette assembly is the integration of individual recited components into a single cassette—is the key contested issue in this case. Moreover, in deciding to grant Site's motion for a preliminary injunction on December 9, 1992, I concluded that Site is likely to prevail on the merits of this issue.

In my bench opinion issued on December 9, 1992, I first rejected Surgin's argument that, by the term "cassette assembly," Kenneth Cook, the inventor of the Site device, intended to describe a device that integrates the functions of aspiration, collection, and infusion into a single unit. I concluded that the phrase "cassette assembly" was not a term of art, *see* Bench Opinion at 15, and I took that phrase "to mean a box with ingredients within and attachable to the box." *Id.* at 16. In rejecting Surgin's argument under the reverse doctrine of equivalents,[3] I stated:

> I am at this stage not of the view that the core of the Cook invention lay in its inte-

gration into a unit that could be thrown away, though that aspect was certainly in Cook's mind and his preferred embodiment of his invention was one that was inclusive even to the point of emphasizing the collector bottle. My reading of the patent is that more probably than not the integration element was [a] significant but secondary purpose, that focal to Cook's design was the prepackaging of the elements that are contained within the plastic housing, that is to say and by that I mean what is referred to at various points in Cook's claims as the body. ... Within that body the placing of the necessary tubings in a fixed posture such that there would not have to be any arranging of what theretofore had been troublesome components preoperatively.

*Id.* at 21–22.

Surgin makes one argument in support of its integration theory that it did not make in opposition to Site's 1992 motion for a preliminary injunction. *See* Surgin's Reply, at 10. Surgin explains that claim 15, the claim on which Site moved for a preliminary injunction, describes a cassette assembly in the preamble but does not recite a collection vessel as one of the cassette assembly elements. Surgin further notes that Site argued in support of its motion for a preliminary injunction that, because some of the other claims explicitly recite the collection vessel as an element of the cassette assembly, under the principle of claim differentiation[4] that element cannot be read into claim 15. Surgin quotes from Site's 1992 Reply Brief to Surgin's Post–Hearing Brief as follows:

> The words "cassette assembly" appear in the preamble of each of the claims, and each claim sets out a number of interrelat-

---

**3.** The reverse doctrine of equivalents enables an accused product that literally infringes nonetheless to avoid infringement if the accused product "is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097 (1950). *See also, e.g., SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1124 (Fed.Cir. 1985).

**4.** "The concept of claim differentiation states that claims should be presumed to cover different inventions. This means that interpretation of the claims should be avoided if it would make one claim read like another." *Carborundum Co. v. Combustion Engineering, Inc.*, 505 F.Supp. 1011, 1017 (D.Del.1981). *See also Matsushita,* 775 F.2d at 1122 ("It is settled law that when a patent claim does not contain a certain limitation and another does, that limitation cannot be read into the former claim in determining either validity or infringement.").

ed components which it is said "comprise" the cassette assembly. Unquestionably, it is those listed components which make up the particular cassette assembly for that particular claim.

Surgin's Reply, at 10 (quoting Site's 1992 Reply to Surgin's Post–Hearing Brief, at 12–13). Surgin now argues that the court adopted Site's claim differentiation argument and thus it is the law of the case.

The way Surgin would like me to read the quoted passage from Site's brief (and to recall my reasoning in deciding to grant the preliminary injunction) is that, although the phrase "cassette assembly" requires integration into a single unit, it only requires integration of the elements recited in the particular claim. Because claim 15 does not recite a collection canister as an element, "cassette assembly" as used in claim 15 cannot be understood to require the integration of the collection canister with the cassette housing. However, the other claims that do recite a collection canister as an element of a "cassette assembly" necessarily require integration of the canister with the housing.

Surgin's reading of the passage quoted from Site's Reply to Surgin's Post–Hearing Brief is a plausible but not a necessary one. Site does not, in that passage, say anything about integration. More important, Surgin's contention that, in my Bench Opinion, I adopted its reading of Site's argument cannot be reconciled with my statement that I took the phrase "cassette assembly" "to mean a box with ingredients within *and attachable to* the box." Bench Opinion, at 16 (emphasis added). Surgin's argument that I adopted the position that integration is required with respect to the recited elements is similarly incompatible with my conclusion that integration was not the key feature of the invention.

Insofar as Surgin's arguments in its current reply brief rely on the premise that integration is the essence of the Site device, I reject those arguments for the reasons that led me to reject that premise in December 1992.[5]

With respect to claim 10, Site concedes that Surgin's device does not literally infringe that claim—which contains the limitation of a "vent means disposed in said upper housing portion, containing said suction port"—because the suction port in Surgin's housing is located in the lower portion rather than in the upper portion of the housing. However, Site argues that Surgin's placement of the port in the lower portion of the cassette housing infringes under the doctrine of equivalents. For support, Site points to Beuchat's explanation that Surgin's external suction port is attached to flexible tubing inside the housing and thus the external port can be positioned at will anywhere on the exterior of the cassette without affecting the operation of the cassette. *See* Site's Response, at 7.

In its reply, Surgin rebuts this doctrine of equivalents argument with a persuasive claim differentiation argument. Surgin notes that claim 10 includes the upper housing limitation, but claim 15—the reissue claim that, according to Cook's reissue application, is a rewrite of claim 10—does not. Whereas claim 10 describes a "vent means disposed in said upper housing portion, containing said suction port," claim 15 describes a "vent means disposed in said upper housing portion." Described in detail below is Surgin's argument that it is entitled to summary judgment on claim 15 because, in Site's reissue declaration, Site failed to disclose, among other things, the change in claim 15 that omitted the requirement that the port be located in the upper portion of the housing.

---

5. Surgin also argues in its reply that prosecution history bars Site from asserting infringement under the doctrine of equivalents. The doctrine of prosecution history estoppel (or "file wrapper" estoppel) "limits a patentee's reliance on the doctrine of equivalents by preventing him from contending later in an infringement action that his claims should be interpreted as if limitations added by amendment [during patent prosecution] were not present." *Jonsson v. Stanley Works,* 903 F.2d 812, 821 (Fed.Cir.1990). To support its prosecution history estoppel argument, Surgin relies upon the same statements in the patent specification on which it relied to support its integration argument. Because Surgin's prosecution history estoppel argument is essentially a restatement of its integration argument, I reject Surgin's prosecution history argument for the reasons given above.

In response to Surgin's argument, Site does not contend that the change was insignificant—instead, Site contends that the reissue declaration did in fact disclose, at ¶ 7, that the port might have to be moved so as not to breach chamber 182. Given that Site takes this position in response to Surgin's renewed motion for summary judgment on the reissue claims, Surgin cannot argue that placing the opening in the upper portion of the housing is functionally equivalent to placing the opening in the lower portion of the housing. Because Site has admitted that the location of the port has significance, Surgin is entitled to summary judgment on claim 10.

For the reasons given above, Surgin's motion for summary judgment on claims 1–8, 11–14 and 16 of the '250 patent is denied. Surgin's motion for summary judgment on claims 9 and 10 is granted.

## III. Surgin's renewed motion for summary judgment on the reissue claims (claims 12–18) of the '250 patent

On June 3, 1993, Surgin moved for summary judgment in its favor with respect to claims 12 through 18 of the '250 patent. Surgin argued that Site's effort to obtain a reissue of its patent 4,627,833 (the '833 patent) failed to comply with statutory and regulatory requirements, and that claims 12 through 18 of the '250 patent—the reissue claims—are therefore ineffective. On September 17, 1993, I heard oral argument on Surgin's motion for summary judgment. I denied the motion but indicated that I would be willing to consider a renewed motion for summary judgment at a later date. On January 3, 1994, Surgin renewed its motion for summary judgment with respect to the reis-

sue claims. I heard argument on this motion on April 8, 1994. Pursuant to the instructions I gave during the April 8 hearing, Surgin filed a post-hearing brief making a new argument in support of its position. The discussion below addresses the arguments made in, and in Site's responses to, Surgin's original motion for summary judgment, Surgin's renewed motion, and Surgin's brief submitted after the April 8, 1994 hearing.

The reissue process under 35 U.S.C. § 251 allows a patentee whose original claims were either overly broad or overly narrow to correct the errors or deficiencies in the original patent.[6] The applicable regulation, 37 C.F.R. § 1.175(a), requires the reissue declaration to disclose each defect to be corrected and to explain how each error arose or occurred.[7] Surgin contends that (1) certain reissue claims are invalid because of the reissue declaration's failure to disclose each defect to be corrected, and (2) certain reissue claims are invalid because of the reissue declaration's failure to disclose how each error arose or occurred. I will address each contention in turn.

### A. *Failure to Disclose Each Defect to be Corrected*

In support of its reissue application, Site submitted a reissue declaration signed by Kenneth Cook, the inventor of the Site device. The declaration states in paragraph 2:

I am informed and believe that U.S. Patent No. 4,627,833 may be partially inoperative by reason of the fact that the original patent claims less than I had the right to claim and that the scope of the claims may be too narrow to adequately protect

---

6. The reissue statute, 35 U.S.C. § 251, states in relevant part:

Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the tern of the original patent.

7. Section 1.175(a) states that the reissue declaration must identify the changes by, among other things:

(3) When it is claimed that such patent is inoperative or invalid "by reason of the patentee claiming more or less than he had the [sic] right to claim in the patent," distinctly specifying the excess or insufficiency in the claims.

\* \* \* \* \* \*

(5) Particularly specifying the errors relied upon, and how they arose or occurred.

the invention disclosed in the original application because an unnecessary element was included in the claims, namely, the first and second ports in the independent claims 1, 5, 7, 10 and 11. I have added new independent claims 12 though 16 which rewrite claims 1, 5, 7, 10 and 11 without the ports.

The claims may also be inadequate to cover the scope of my invention because there are no claims separately directed to the infusion. The preferred embodiment of my invention has an infusion circuit and a vacuum circuit. Independent claims 1 and 10 recite a vacuum. Independent claims 5, 7 and 11 are directed to a general circuit which could be either infusion or vacuum. I have added new claims 17 and 18 specifically reciting infusion.

That is, the reissue declaration states that reissue is sought because the original claims 1, 5, 7, 10, and 11 used the word "port," which was overly narrow, to describe openings in the cassette housing, and because the original claims 5, 7, and 11 recite only a vacuum circuit, whereas the preferred embodiment of the invention has a vacuum circuit and an infusion circuit.

According to Cook's declaration, reissue claim 15 is a rewrite of claim 10. In accordance with that declaration, claim 15 eliminates the element of "ports," and instead refers to an "opening" and a "flexible rubber tubular conduit" that extends through the opening. This is not the only distinction between claim 15 and claim 10, however. Surgin argues that the following three changes were made in rewriting claim 10 as claim 15 but were not explicitly disclosed: (1) whereas claim 10 describes a "means through which fluid may flow to a source of vacuum to a control console" (column 12, lines 14–16), claim 15 describes a "means in said housing for communicating with a source of vacuum in a control console" (column 13, lines 61–62); (2) whereas claim 10 describes a lower portion that "includes an opening therein to expose an occludable portion of said flexible rubber tubular conduit in response to a signal" (column 12, lines 33–35), claim 15 omits

the phrase "in response to a signal" (column 14, lines 13–15); and (3) whereas claim 10 describes a "vent means disposed in said upper housing portion, containing said suction port" (column 12, lines 38–39), claim 15 simply describes a "vent means disposed in said upper housing portion" (column 14, line 20)—omitting the requirement that the suction port be in the upper housing.

▬▬▬ Site argued for the first time during the April 8, 1994 hearing, and in detail in its post-hearing brief, that this court should not compare claim 15 with claim 10 in order to determine whether claim 15 made changes that were not disclosed in the reissue declaration. Site contends that the relevant comparison is between claim 15 and the original claims as a group. This contention is unpersuasive. A reissue claim must be compared with the original claim that "most nearly approaches" the reissue claim in question. See In re Self, 671 F.2d 1344, 1345–46 (C.C.P.A.1982); In re Ruth, 278 F.2d 729, 731 (C.C.P.A.1960). Site has admitted on at least two occasions that claim 10 most nearly resembles reissue claim 15. In paragraph 2 of the reissue declaration, Cook stated that reissue claim 15 was a rewrite of claim 10. In response to requests for admissions in this action, Site stated that reissue claim 15 was a rewrite of claim 10. See Wood Aff., Exh. J. (filed on June 4, 1993 with Surgin's lead brief). Accordingly, I reject Site's argument that claim 15 should be compared with claims 1 through 10 as a whole, rather than with claim 10 alone.[8] Having rejected Site's latest argument, I will now address the arguments Site made earlier, in response to Surgin's original and renewed motions for summary judgment.

▬▬▬ Site's position with respect to the third change described above—the omission of the requirement that the suction port be located in the upper housing—is that the change was fully disclosed in the reissued declaration. In paragraph 7 of the declaration, Cook explains that "[t]he opening that replaces port 112 would be placed so as not to breach chamber 182 or chamber 182 would

---

8. I do not need to address Surgin's argument that, assuming arguendo that claim 15 should be compared with the ten original claims, Site's disclosure was nonetheless inadequate.

be eliminated and entrance port 190 would be connected directly to suction aperture 204 by additional tubing as it is in the present commercial embodiment of my cassette." Site argues that this statement indicated that the port in the upper housing portion would not necessarily be replaced by an opening in the same location. Site contends that Cook's declaration specifically discussed the need to move any hole replacing port 112 to a location where it would not breach chamber 182, *i.e.*, out of the upper housing portion. I am persuaded that the cited sentence in the reissue declaration adequately disclosed the omission of the requirement that the suction port be located in the upper portion of the housing.

■ As described above, whereas claim 10 describes a "means through which fluid may flow to a source of vacuum to a control console," claim 15 describes a "means in said housing for communicating with a source of vacuum in a control console;" and whereas claim 10 describes a lower portion that "includes an opening therein to expose an occludable portion of said flexible rubber tubular conduit in response to a signal," claim 15 omits the phrase "in response to a signal." With respect to these two changes, the position taken by Site in its responses to Surgin's original and renewed motions for summary judgment is that those changes do not alter the scope of the claim, and that only scope-altering claims need to be disclosed. Site contends that, because these changes are immaterial, they do not need to be addressed in the reissue declaration. Surgin argues that the changes do alter the scope of the claims, and that the failure to address them in the reissue declaration renders the claims invalid. Both Site and Surgin have submitted large numbers of affidavits concerning the significance of the changes identified by Surgin. Surgin correctly states that, because claim interpretation is a matter

of law, the question whether the changes in the reissue claims substantively alter the scope of the claims is also a question of law. Nonetheless, the question whether the scope of claims has been substantively altered cannot be adjudicated in a summary fashion, because its resolution turns on underlying factual disputes.[9] *See Tillotson, Inc. v. Walbro Corp.*, 831 F.2d 1033, 1038 (Fed.Cir. 1987) (holding that summary judgment was improperly granted "in view of the need for careful interpretation of the original and reissue claims in light of the specification, the prosecution history, and the alleged industry practice....").

■ In addition to arguing that the changes made but not disclosed were scope-altering, Surgin also argues that the law requires a reissue applicant to identify and explain every change in language—scope-altering or not. Site disagrees.

Site's argument that a reissue applicant may make immaterial language changes without pointing them out or explaining them in the reissue declaration goes as follows: An immaterial change that does not affect the scope of the patent claim is not an "error." It would be improper for the Patent Office to reissue a patent based on an asserted "error" that did not affect the scope of the patent. *See In re Clark*, 522 F.2d 623, 625–26 (C.C.P.A.1975). Because an immaterial change is not an "error" (or an "excess or insufficiency in the claims"), the regulations do not require the immaterial change to be addressed in the reissue declaration. Therefore, a reissue applicant may make immaterial changes in language in reissue claims without explanation.

Surgin's argument follows essentially the same lines, but reaches a·different conclusion. Surgin's argument, in outline, is as follows: A change in the language of a claim

9. For example, in support of its position that the first change identified by Surgin does not alter the scope of the claim, Site points to the affidavit of Mossadeq Houssain, who states that one skilled in the art would know that "communication" and "fluid communication" mean the same thing. In response, Surgin acknowledges that "communication" and "fluid communication" may be used synonymously if the embodiment is a "diaphragm" type vacuum pump like that described in Cook's preferred embodiment, but argues that the terms are not synonymous for peristaltic type vacuum pumps such as those disclosed in the Steppe patent. *See* Surgin's Original Reply, at 8–9. This type of dispute is not appropriately resolved at the summary judgment stage.

that does not affect the scope of the claim is not an "error." Section 251 only allows reissue to correct "errors." Therefore, textual changes in a reissue application that do not amount to "errors" are not permitted, and any reissue that contains textual changes other than "errors" must be invalidated.

■■■ The cases cited by the parties do not resolve the issue. It is apparent from *In re Clark*, 522 F.2d 623 (C.C.P.A.1975) that a reissue application that asserts no defects must be denied. *Id.* at 626. It is likewise apparent that a reissue declaration must address every "excess and insufficiency." *In re Constant*, 827 F.2d 728, 729 (Fed.Cir.1987), *cert. denied*, 484 U.S. 894, 108 S.Ct. 251, 98 L.Ed.2d 209 (1987). Neither of these cases, however, definitively answers the question whether a reissue application that properly asserts a deficiency may include other, non-material, changes in wording.

Language in *Constant* suggests that non-material changes may not be included without explanation. The *Constant* court noted: "Appellant argues that the Board [of Patent Appeals and Interferences] erred in its construction of 37 C.F.R. § 1.175(a)(3) by requiring appellant to specify every difference between the original and reissue claims. This argument is not persuasive." *Id.* The court further quoted approvingly from § 1444 of the *Manual of Patent Examining Procedures* ("MPEP"), a Patent and Trademark Office publication. Section 1444 of the MPEP states in part:

> The examiner must check that each and every change in the specification or claims is supported in either the original or a supplemental, oath or declaration. Every departure from the original patent represents an "error" in said original patent under 35 U.S.C. § 251 and must be particularly and distinctly specified and supported in the original, or a supplemental, reissue oath or declaration under § 1.175.

*See also Constant*, 827 F.2d at 729 (quoting only the second sentence of the above excerpt).[10] Moreover, requiring the reissue ap-

plicant to specify every change or departure in the reissue application allows the Patent and Trademark Office to make the initial determination of whether a proposed change in text effects a change in the scope of the patent. And it surely makes for better administrative practice to entrust responsibility for that initial determination to the Patent and Trademark Office rather than to the district courts.

For these reasons, I conclude that Site's failure to disclose the first change (the omission of the requirement that the communication be fluid communication) and the second change (the omission of the requirement that the opening be exposed "in response to a signal") entitles Surgin to summary judgment on claim 15. Moreover, Site's failure to disclose the first change entitles Surgin to summary judgment on claim 12 as well. Claim 12 is the reissue rewrite of claim 1. Whereas claim 1, like claim 10, describes a "means through which fluid may flow to a source of vacuum in a control console" (column 10, lines 48–50), claim 12, like claim 15, describes a "means in said housing for communicating with a source of vacuum in a control console" (column 13, lines 7–8).

B. *Failure to Disclose How Errors Arose or Occurred*

■■■ Section 1.175(a) of 37 C.F.R. requires that the reissue declaration "[p]articularly specify[ ] the errors relied upon, and how they arose or occurred." The Federal Circuit has explained the reissue requirements as follows:

> "There are two distinct statutory requirements that a reissue oath or declaration must satisfy. First, it must state that the patent is defective or partly inoperative or invalid because of defects in the specification or drawing, or because the patentee has claimed more or less than he is entitled to. Second, the applicant must allege that the defective, inoperative, or invalid patent arose through error without deceptive intent." In sum, the statutorily required "error" of section 251 has two

---

10. Section 1414.03 of the MPEP similarly states: Any change or departure from the original specification or claims represents an 'error' in

the original patent under 35 U.S.C. § 251 and must be addressed in the original, or supplemental reissue oath or declaration.

parts: (1) error in the patent, and (2) error in conduct.

*Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 882 F.2d 1556, 1564 (Fed.Cir.1989) (quoting *In re Wilder*, 736 F.2d 1516, 1518 (Fed.Cir.1984), *cert. denied*, 469 U.S. 1209, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985)) (other citations omitted). The MPEP further explains the requirement that the reissue applicant explain an error in conduct:

> It is particularly important that the reissue oath or declaration specify in detail how the errors arose or occurred. "How" includes when and under what circumstances the errors arose or occurred. This means that the reissue oath or declaration must specify the manner in which "the errors" "arose or occurred." For example, the reissue oath or declaration must indicate when and the manner in which the reissue applicant became aware of the prior art or other information and of the error in the patent; such as, for example, through discovery of prior art or other information subsequent to issuance of patent, knowledge of prior art or other information before issuance of patent with significance being brought out by third party, through allegations made in litigation involving the patent, etc.

MPEP § 1414.03.

Surgin argues that the reissue declaration failed to disclose how at least two errors arose or occurred: (1) the use of the term "port" rather than "opening," and (2) the omission of separate claims to cover the infusion circuit. Paragraph 5 of the Cook declaration states that Site became aware of the errors in the '833 patent during discussions on October 18, 1988, with a third party, in which the third party stated that the inclusion of the word "ports" limited the patent. The declaration nowhere explicitly states how the errors occurred; instead, it merely states that the errors arose "without deceptive intent." *Id.* at ¶¶ 3, 7.

Once again, the cases cited by the parties do not appear to resolve definitively whether the failure to explain how the errors arose is a fatal defect. Surgin relies heavily on *Alcon*

*Laboratories, Inc. v. Allergan, Inc.*, Civ. No. 4–88–333–E, 1990 WL 267418 1990 U.S. Dist. LEXIS 13348, 17 U.S.P.Q.2d (BNA) 1365 (N.D.Tex.Aug. 28, 1990). In that case, the inventors submitted a reissue declaration in which they stated that the errors at issue "occurred as a result of oversight in the preparation and review of the patent application. These errors arose inadvertently without any deceptive intention on my part." Quoted in *Alcon*, 1990 WL 267418 at *12, 1990 U.S. Dist. LEXIS 13348 at *36. At trial, it became apparent that the error was the result of inadvertent oversight on the part of the attorney who drafted the patent. The court concluded that the declaration did not make an adequate showing of how the error occurred: "The mere conclusion that the error was made through oversight in drafting by the patent attorney, without more, falls short of what the regulation requires." *Alcon*, 1990 WL 267418 at *12, 1990 U.S.Dist. LEXIS 13348 at *38. The Cook declaration, Surgin argues, falls short of even the declaration in *Alcon*, in that it fails to include even the insufficient statement that the error was the result of oversight.

Site contends that the vitality of *Alcon* as persuasive authority is seriously called into question by the Federal Circuit's decision in *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565 (Fed.Cir. 1991). In that case, the reissue applicant filed two reissue declarations by the attorneys responsible for the original patent prosecution. Each declaration stated that the errors had arisen because the attorneys "did not fully appreciate the nature and extent of [the] discovery" and "did not fully appreciate ... [that?] claims of the type sought by reissue were possible."[11] The Federal Circuit concluded that these declarations were sufficient, noting that "[f]ailure of the attorney to claim the invention sufficiently broadly is 'one of the most common sources of defects.'" *Scripps*, 927 F.2d at 1575 (quoting *In re Wilder*, 736 F.2d at 1519). I do not believe that *Scripps* is incompatible with *Alcon:* although the *Scripps* declarations are not models of specificity, they do give signifi-

---

11. The declarations are not set forth in the Federal Circuit opinion, but can be found in the district court opinion at 707 F.Supp. 1547, 1558–59 (N.D.Cal.1989).

cantly more detail than the *Alcon* declaration.

Site also relies on *Advanced Cardiovascular Systems v. Scimed Life Systems,* 783 F.Supp. 413 (D.Minn.1991). In that case, the initial reissue declaration stated that the error was caused by the attorney who handled the first application. The patent examiner requested a more definite statement of how the error occurred, and the applicant submitted a supplemental declaration stating: "I am unaware of how the error occurred but it obviously occurred during the preparation and prosecution of the application . . .". *Id.* at 414. Concluding that the key issue was whether there was deceptive intent, and that the initial and supplemental declarations showed no evidence of intent to deceive, the court held that this statement was sufficiently detailed. *Id.* at 416.

It is apparent that there is some uncertainty as to how much detail is required in the reissue declaration about how the error arose. The Cook declaration, however, falls short of the declarations in all of the above-cited cases: instead of stating in even broad or ambiguous terms how the error arose, it simply states, in conclusory fashion, that the error arose "without deceptive intent." Such a statement cannot possibly give the patent examiner a factual basis for concluding that the error did or did not arise without deceptive intent. This conclusion, however, does not end the matter.

Site argues that it can be inferred from the other recitations of the declaration that the error was inadvertent. In particular, Site points to the recitation of how the error was discovered: during discussions with a third party, the third party claimed that its product did not infringe Site's patents because of the "port" and "vacuum" elements, which the competitor read as limitations. The declaration that Site was unaware of the error until this point, Site contends, fully supports an inference that the error was inadvertent and

without fraudulent intent. Site draws support from two sources. First, it notes that MPEP § 1414.03 gives as an example of how an error arose a description of how and when the error was discovered. It further notes that in *In re Keller,* 642 F.2d 413 (C.C.P.A. 1981), the court approved a reissue declaration,[12] and in doing so noted that the declaration before it matched an example set forth in the MPEP (not the same example relied upon by Site). In Site's view, *Keller* establishes the proposition that compliance with an example given in the MPEP establishes as a matter of law the sufficiency of the reissue declaration.

I believe that Site is incorrect for two reasons. First, the *Keller* court expressly confined its holding to the facts before it, concluding that the reissue declaration before it was adequate; it did not establish the general rule of law that Site attributes to it. Second, at the time of the *Keller* decision, an earlier version of the MPEP was in effect. The MPEP as it stood when Site filed its reissue application, several years after *Keller,* contained a provision that substantially undermine's *Keller*'s authority. That provision states: "Reissue oaths or declarations must point out very specifically what the defects are and how and when the errors arose, and how and when the errors were discovered." MPEP § 1414. This language was adopted by the Federal Circuit in *Hewlett–Packard Co. v. Bausch & Lomb Inc.,* 882 F.2d 1556, 1565 (Fed.Cir.1989).

Based on the foregoing discussion, I conclude that the reissue declaration failed to disclose how at least two errors arose or occurred: the use of the term "port" instead of the broader term "opening," and the omission of claims specifically covering the infusion circuit. Site's failure to explain how the "port" defect arose or occurred entitles Surgin to summary judgment in its favor with respect to claims 12–16; Site's failure to explain how the infusion circuit omission

---

12. The declaration stated that, subsequent to the issuance of the original patent, "the applicant has, in connection with the prosecution of corresponding foreign patent applications, been made aware of prior art relevant to patentability not previously considered by the Patent Office, which prior art might cause the Examiner to deem the original patent wholly or partly inoperative or invalid." The declaration further stated that, "to the extent the amendment might be deemed to correct errors in the original patent, such errors arose without any deceptive intent or purpose upon the part of said applicant." Quoted in *Keller,* 642 F.2d at 420–21.

arose or occurred entitles Surgin to summary judgment in its favor with respect to claims 17 and 18.

## IV. Surgin's motion for an increase in security bond amount

■ The amount of damages that Surgin can recover for an improvidently granted injunction is limited to the bond amount. *See W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757, 770 n. 14, 103 S.Ct. 2177, 2185 n. 14, 76 L.Ed.2d 298 (1983). In December of 1992, I set the security bond at $350,000. Surgin now argues that the bond should be set at $1.85 million because, under Surgin's revised calculations, the injunction has already cost Surgin $1.4 million.

The key difference between Surgin's current application to increase the bond and its earlier presentation is in the projection of sales of its cassette system for years 2 and 3 of its marketing life. In a declaration in support of the earlier presentation, Mr. Wortrich stated that Surgin's anticipated sales were expected to be $175,000 in year 1, $220,000 in year 2 and $275,000 in year 3— about a 25% increase in sales each year.

Surgin now argues that the calculations and data in the declaration of Mr. Wortrich were erroneous because Mr. Wortrich was not able to consult with Mr. Maaskamp, who was in charge of sales and marketing for the product. In its current motion, Surgin claims anticipated sales during marketing years 2 and 3 of $882,000 and $1,071,000, respectively. The basis for this quadrupling of the year 2 and year 3 sales projections is disclosed in Mr. Maaskamp's declaration to be a marketing plan for Surgin's cassette system dated June 17, 1991, which predicts that Surgin would have a market share of 9% in year 1, 14% in year 2, and 17% in year 3.

Site first objects to the fact that, despite pertinent discovery requests, the marketing plan was not produced. Surgin responds that the document was misfiled and was not found until December 1993. Site also takes issue with the assertion that Maaskamp was "unavailable" during the time the Wortrich declaration was prepared. Site notes that it deposed Maaskamp on November 23, 1992, and concludes that Maaskamp was clearly available during the critical period.

Site also argues that it is prejudiced by Surgin's delay. First, Site contends that, because Surgin could, before the injunction was issued, have moved for summary judgment on the ground that the reissue application was flawed, Surgin should be denied compensation in the event that the injunction turns out to have been improvidently issued. Surgin responds that it did not have the information it needed to make this motion until it deposed Cook, the inventor. This response is unpersuasive. For the reasons given above, the reissue application is flawed on its face. Second, Site contends that, had it known the extent of Surgin's alleged damages, it would have pressed for an early trial. Site refers to several letters in which it sought an early discovery cutoff date, to which Surgin objected.

Finally, Site challenges Maaskamp's estimates that Surgin would achieve market shares of 9% in year 1, 14% in year 2, and 17% in year 3. Site explains that a 9% penetration rate would have yielded dollar sales of at least $425,250 by the end of July, 1992. In fact, Surgin's sales through July were only $144,996. A review of the number of cassettes sold monthly from January to July, 1992 does not indicate that the number of Surgin cassettes sold monthly was increasing. The average number of cassettes sold monthly from January to July 1992 was about 600. Assuming that the injunction remains in effect for a total of 25 months, Surgin would lose 15,000 cassette sales. Using Surgin's stated cassette price of $35 and profit margin of 66%, Surgin earns a $23.10 profit from each cassette sold. Loss of 15,000 cassette sales would result in a corresponding loss of $346,000 in profits—that is, an amount less than the $350,000 security bond. Although it is of course possible that Surgin's market penetration would have increased since 1982, in light of the other bases articulated by Site for denying Surgin's motion for an increase in the security bond, I conclude that the motion should be denied.

## V. Conclusion

For the reasons given above:

1. Surgin's motion for summary judgment on claims 1–14 and 16 (docket # 96) is granted in part and denied in part. The motion is granted with respect to claims 9 and 10, and denied with respect to claims 1–8, 11–14 and 16.

2. Surgin's renewed motion for summary judgment on the reissue claims (claims 12–18) (docket # 99) is granted; and

3. Surgin's motion for an increase in the security bond amount (docket # 103) is denied.